**E-FILED**
Thursday, 08 March, 2007  09:00:00 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

WILLIE SMITH,

       Plaintiff,

       v.                                        05-CV-3281

MOHAMMAD IRSHAD, M.D.,
STEPHEN CULLINAN, M.D.,
DAVID HUFFMAN, M.D.,
ROGER WALKER,
SHERRY HILE,

       Defendants.

## Order

       Plaintiff claims Defendants have been deliberately indifferent to his serious medical needs. Before the court are Defendants' respective motions for summary judgment.  After careful consideration of the parties' submissions, the court concludes that the plaintiff has not established a reasonable inference that anyone was deliberately indifferent to his medical needs. Accordingly, summary judgment must be granted to Defendants and this case terminated.

*Summary Judgment Standard*

       A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56(c).  This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837.  A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).

       In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).  However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Facts*

The court adopts these undisputed facts essentially verbatim from Dr. Irshad's memorandum in support of summary judgment (d/e 24).  The cites refer to the attachments to that motion.  The plaintiff's response does not create a justiciable dispute regarding any of the facts below.

1. Plaintiff, Willie L. Smith, was incarcerated at Logan Correctional Center when he filed this lawsuit, and he is currently incarcerated there.

2. The medical records state that Mr. Willie Smith was seen at Logan for reception screening on March 22, 2004. (See Exhibit 2A.)

3. Dr. Irshad provided care and treatment to the Plaintiff from March of 2004 through October of 2004. (Affidavit of Dr. Irshad)

4. In response to the complaints made by the Plaintiff, the Plaintiff  was diagnosed with peripheral arterial disease. (Exhibit 1.)

5. Dr. Irshad referred the patient to Dr. Lori Rolando for evaluation of his complaints. (See Exhibit 1.)

6. Mr. Smith first complained of symptoms referenced in this Complaint on March 29, 2004 to a nurse during nurse sick call. (See Exhibit 2B.)  Mr. Smith complained of pain in his right calf. The medical record notes as follows:

> Inmate complains of pain in the right calf; inmate self reports pain in right calf. Has been increasing when he walks. Calf cramps and pain increases 10 on scale of 1 to 10. When stops walking, pain stops and cramps get better. No redness, no cordlike tendon. When palpates calf, able to feel small B-like masses (2) and when feel these masses, inmate self-reports the pain would be 7 or 8. Pulses in foot within normal limits. Foot warm. Cap refill within normal limits. Inmate self-reports when he lays in bed, cramps increase and leg starts to get numb, but when he gets up numbness disappears. Plan: MD Line, Motrin 400 mg orally 4 times a day for 7 days, rest-ice, no strenuous activity or sports. (See Exhibit 2B.) Inmate self-reports when laying down while here, pain disappears, no cramps. Will have MD evaluate calf on 3/31/04. (See Exhibit 2B1 and 2B2.)

7. Dr. Irshad first saw Mr. Smith personally on April 9, 2004. On that date, Mr. Smith's records state as follows:

S (subjective): claudication in the right leg - more than left on walking
one block. Has to stop walking. O (objective): pulses unable to feel -
feels also numbness in foot. A (assessment): PAD (peripheral arterial
disease). Get Doppler vascular study - arterial. No smoking. Plan:
Doppler arterial study of legs. (See Exhibit 2C.)

8. Based upon Dr. Irshad's examination of April 9, 2004, he determined that Mr. Smith
suffered from peripheral arterial disease. Dr. Irshad ordered a Doppler arterial study of his legs in
order to further evaluate his condition. (See Exhibit 2.)

9. Mr. Smith was escorted by security to Memorial Medical Center in Springfield, Illinois,
on April 20, 2004 for those studies. (See Exhibit 2D.)

10. Dr. Irshad next saw Mr. Smith again on April 29, 2004. (See Exhibit 2.)  On that date,
Dr. Irshad's notes indicate as follows:

S: claudication in right leg. Leg tightening on walking - numbness,
aching pain in leg. O: Doppler study - abnormal, significant disease.
A: PAD, LDL 145, surgical consult. Plan: 1) no smoking; 2) keep
walking; 3) vascular surgeon consult; 4) slow walk pass time 6
months. Dietary instructions given for low-fat diet. Prescriptions for
Trental and aspirin were given. (See Exhibit 2E.)

11. Based upon the results from the Doppler study, Dr. Irshad advised Mr. Smith to stop
smoking, to keep walking, and to refer the patient for a vascular surgeon consult. Dr. Irshad
ordered a slow walk pass for six (6) months, as well as giving Mr. Smith dietary instructions for a
low-fat diet.  Mr. Smith was given Trental and aspirin to help deal with the claudication and the
pain associated therewith.  (See Exhibit 2E.)

12. On May 27, 2004, Mr. Smith was escorted by security to Dr. Rolando's office at
Memorial Medical Center in Springfield, Illinois. Dr. Rolando is a cardiovascular surgeon. (See
Exhibit 2F.)

13. Dr. Irshad was provided with a typewritten report from Dr. Rolando regarding her
evaluation of the Plaintiff's claudication. (See Group Exhibit 2G.)

14. According to Dr. Rolando's report, she found that Mr. Smith suffered from bilateral
lower extremity claudication which was worse on the right. She recommended that the patient
continue taking Trental. She also advised that the patient continue walking. She recommended an
MRI of the patient's aorta (also referred to as an MRA) and instructed the patient to quit smoking.
She indicated that she would review the results of this test and would have further
recommendations once that was reviewed. (See Exhibits 2G1 through 2G3.)

15. After reviewing Dr. Rolando's report, Dr. Irshad ordered the recommendations made

by Dr. Rolando for this patient. (See Exhibit 2H.)

16. Mr. Smith was sent back to the Springfield Clinic for his appointment with Dr. Rolando to obtain the MRI of his aorta (MRA). (See Exhibit 2I.)

17. Dr. Irshad reviewed the patient's reports relating to the MRA of June 18, 2004. Dr. Irshad agreed with the recommendations contained within the report. (See Exhibit 2J.)

18. That report is attached hereto as Exhibit 2K. The MRA suggested atherosclerotic disease, including occlusion of the right common femoral artery. This document was reviewed by Dr. Irshad on June 30, 2004. (See Exhibit 2K.)

19. Dr. Irshad next saw Mr. Smith on August 23, 2004. His notes from that date are as follows:
S: Same pain in right leg. Has PAD very same. O: - Discuss results with vascular surgeon. Surgeon wants to wait and reassess in few months' time. A: - severe PAD, no work. Low bunk bed, slow walk for one year. Plan: Fasting lipid panel, memo to Kay Nelson for arranging follow-up visit with vascular surgeon. (See Exhibit 2I.)

20. Dr. Irshad's assessment on August 23, 2004 was that the patient continued to have the same pain in his right leg. He discussed the results of the test with Mr. Smith and advised him that the surgeon wanted to wait. At that time, Dr. Irshad arranged with the appropriate personnel to have a follow-up visit scheduled with the vascular surgeon. (See Exhibit 2I.)

21. Mr. Smith was back to the healthcare unit for his lab work on August 26, 2004. (See Exhibit 2L.)

22. Dr. Irshad next saw Mr. Smith on September 10, 2004. His notes from that record are as follows:

S: PAD lab. O: TC 230; LDL 166. A: Hyperlipidemia. PAD. Plan: LDVA status 20 mg HS diet for 6 months. Dietary instructions given. (See Exhibit 2L.)

23. On September 10, 2004, Mr. Smith's symptoms were consistent with peripheral arterial disease. His labs showed increased cholesterol levels. Dr. Irshad therefore assessed him as having hyperlipidemia and peripheral arterial disease. The plan at that time was to prescribe anticholesterol medication and to modify Mr. Smith's diet. He was advised of these instructions. (See Exhibit 2L.)

24. On September 23, 2004, Mr. Smith was escorted by security to the Springfield Clinic in Springfield, Illinois, for a follow-up visit with his vascular surgeon, Dr. Rolando. (See Exhibit 2L.)

25. The written report from Dr. Rolando for the visit of September 23, 2004 is attached hereto as Exhibit 2M.

26. According to Dr. Rolando, the vascular surgeon affiliated with the Springfield Clinic, she indicated that she needed to review the MRA films, but would like to refrain from having to do a significant bypass procedure, given the patient's young age. She instructed the patient to continue walking and to quit smoking. Dr. Irshad agreed with these assessments and advised the patient of the same information. Dr. Rolando also indicated in Exhibit M that she would like a work-up from a cardiac standpoint as well before discussing all specific interventions regarding the right lower extremity occlusive disease. (See Exhibit 2M.)

27. Subsequent to this visit with Dr. Rolando, Dr. Irshad was no longer working as the Medical Director at the Logan Correctional Center. (See Exhibit 2.)

28. Subsequent to 2004, Dr. Lochard became the Medical Director at the Logan Correctional Center. (See Exhibit 2.)

29. While Dr. Lochard was the Medical Director, Dr. Irshad continued to provide care to the inmates at the Logan Correctional Center on an as needed basis as a staff physician. This consisted of no more than five (5) or six (6) visits to that facility between October 2004 through August 2005. (See Exhibit 2.)

30. In reviewing Mr. Smith's medical records, it appears that Dr. Irshad saw Mr. Smith on one of his "as needed" visits on June 21, 2005. (See Exhibit 2X.)

31. At that time, Mr. Smith was seen by Dr. Irshad for his continued complaints regarding his severe claudication. (See Exhibit 2X.)

32. At that time, Dr. Irshad directed Connie Arnold in the medical records department to check with Dr. Rolando, the vascular surgeon, about her plans for treatment of this patient. (See Exhibit 2X.)

33. The records reflect that Ms. Arnold followed Dr. Irshad's instructions on June 24, 2005 by calling Dr. Rolando's office and faxing the relevant reports to her. The records indicate that Dr. Rolando would call back with her recommendations for this patient's care. (See Exhibit 2X.)

34. Dr. Irshad had no involvement in this patient's care subsequent to June 21, 2005. (See Exhibit 2.)

35. Additionally, Dr. Irshad had no involvement in the patient's care between October of 2004 and June 21, 2005. (See Exhibit 2.)

36. It was significant to Dr. Irshad on June 21, 2005 that the patient had just been sent

out the day before to Memorial Medical Center for tests regarding these complaints. (See Exhibit 2Y.)

37. Until Dr. Rolando had an opportunity to review those tests and make recommendations, there was nothing Dr. Irshad could do beyond expediting those records to her. (See Exhibit 2.)

38. In reviewing the medical records from the Logan Correctional Center, Mr. Smith continued to be treated pursuant to the direction of Dr. Rolando and his treating physicians at the Logan Correctional Center. (See Exhibit 2.)

39. Mr. Smith was seen not only by the onsite physicians throughout November and December 2004, but was referred out to Dr. DeMartini, a cardiologist with the Prairie Heart Institute, for an evaluation of his heart. It appears this occurred on December 9 or 10, 2004. (See Exhibit 2N, 2O1, 2O2).  This report was forwarded to Dr. Lochard and not to Dr. Irshad as he was no longer the Medical Director at Logan.  (See Exhibit 2.)

40. Subsequent to the visit with Dr. DeMartini, the patient continued to be seen by the onsite physicians for continuous monitoring. Mr. Smith was returned to Memorial Medical Center for cardiac catheterization on January 6, 2005 as suggested by Dr. DeMartini. (See Exhibit P.)

41. Once again, Dr. DeMartini provided a written note in the form of a letter written to Dr. Rolando, the vascular surgeon on January 6, 2005. At that time, Dr. DeMartini indicated the patient had no cardiac restrictions for undergoing vascular surgery. (See Exhibit 2Q.)

42. On January 7, 2005, the day following this report from Dr. DeMartini, Plaintiff's medical records indicate that Dr. Lochard discussed the cardiac catheterization with Dr. DeMartini. The plan at that time was to contact the vascular surgeon to discuss the course of care and recommendations. (See Exhibit 2R.)

43. On January 11, 2005, Dr. Lochard noted that he discussed the patient's care with Dr. Rolando, who indicated that she would like to see the patient again before recommending any surgery. (See Exhibit 2S.)

44. Mr. Smith was escorted to see Dr. Rolando on February 7, 2005 for further evaluation to determine whether or not he should receive peripheral vascular surgery. (See Exhibit 2T.) The written report associated with that visit from Dr. Rolando is attached hereto as Exhibits 2U1, 2U2,
and 2U3.)

45. According to Dr. Rolando's report, she indicates under the assessment portion of her evaluation that she,

. . . would not recommend at this point in time any bypass procedures

on his lower extremity. I counseled him that I do not think his
numbness is vasculogenic in nature given the fact that his foot is numb
all the time and he does not have burning or pain isolated to when it
is elevated which would be more consistent with rest pain. Once
again, his toe pressure on the right is well above ischemic range. (See
Exhibit 2U2.)

46. Dr. Rolando ordered Pletal, a medication to treat claudication. (See Exhibit 2U3.)

47. In Dr. Irshad's opinion, Mr. Smith was treated appropriately by him, as well as by
each
and every one of the consulting physicians who weighed in assessing the appropriate care and
treatment for Mr. Smith's peripheral arterial disease. (See Exhibit 2.)

48. Claudication is not a blood clot. (See Exhibit 2.)

49. Dr. Irshad does not dispute that Mr. Smith suffers from peripheral arterial disease.
This condition can be appropriately treated by an internal medicine physician with the assistance
of consultation from a vascular surgeon with respect to the appropriate recommendations to care
for and evaluate the condition of the patient. (See Exhibit 2.)

50. After October 2004, Dr. Irshad was not consulted regarding the appropriate course
of care for Mr. Smith's PAD by any of his treating physicians. (See Exhibit 2.)

*Analysis*

The plaintiff avers that, on June 6, 2004, his right leg "went out" and he injured his lower
back and right leg.  He concludes that he has still not been properly treated for his "clogged artery
ailment and the pain in my leg has increased over the past two years."  He avers, "Everyday I
experience excruciating pain in my right leg.  My leg has gotten darker and my right foot is
partially numb.  I believe my leg is infected or clogged artery ailment is getting worse."  (d/e 28,
Plaintiff's Aff. ¶ 5).  He further avers that in July 2005, Dr. Cullinan (who did not return waivers
of service) stopped all treatment that Dr. Lochard had ordered.  He says he is currently receiving
anti-inflammatory and cholesterol medication, but that those medications do not help.  *Id.* ¶¶ 6-8.

It is clear that Plaintiff has serious medical needs.  The court does not doubt his
description of his right leg and the pain he suffers.  However, it is also beyond doubt that
Plaintiff's medical needs have been taken very seriously by Defendants.  He has received
extensive testing, care and treatment by several specialists outside the prison, including
neurologists and cardiologists, and his condition has been closely monitored at the prison.
Plaintiff is understandably frustrated that modern medicine has not cured him, but his belief that
something more can or should be done is not supported by any evidence in the record.

Similarly, as to Dr. Cullinan (who did not return waiver of service forms), Plaintiff's

assertions that, in July or August 2005, Dr. Cullinan stopped all the treatment Dr. Lochard had ordered is not supported by any evidence. Plaintiff's medical records show he received extensive medical attention, testing and treatment during 2005. (Exs. 7 &8, attached to Dr. Irshad's summary judgment motion: 1/6/05 discharge summary detailing elective angiograph performed on Plaintiff; 2/7/05 report from Dr. Orlando recommending conservative treatment and reporting that Plaintiff had voluntarily stopped one medication because he did not believe it was working; 3/20/05 nerve study report by outside physician; 6/20/05 arterial doppler test done outside IDOC at vascular lab). Plaintiff gives no detail about what Dr. Cullinana did or failed to do that affected Plaintiff's condition in any way. There is simply no evidence that *any* medical professional has been indifferent to Plaintiff's medical needs.

Since there is no evidence of deliberate indifference by any prison medical professionals, there can be no inference of deliberate indifference by any of the other defendants, all non-medical prison officials. In the context of medical treatment, "if a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . ." *Greeno v. Daley,* 414 F.3d 645, 656 (7th Cir. 2005).

IT IS THEREFORE ORDERED:

1) The motions for summary judgment are granted (d/e's 24, 31). The Clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56. All pending motions are denied as moot (d/e 34). The case is terminated. The parties are to bear their own costs.

2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(c). If the plaintiff does choose to appeal, he will be liable for the $455 appellate filing fee irrespective of the outcome of the appeal.

Entered this 8th Day of March, 2007.

s\**Harold A. Baker**

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE